**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**(Tampa Division)**

| | |
|---|---|
| UNITED STATES SECURITIES AND<br>EXCHANGE COMMISSION, | )    CASE NO. |
| | ) |
| | )    8:02-CV-666-T-17EAJ |
| Plaintiff, | ) |
| | ) |
| v. | )    **PLAINTIFF'S** |
| | )    **MEMORANDUM OF** |
| SEBASTIAN CORRIERE, | )    **LAW IN SUPPORT OF** |
| | )    **ITS EX PARTE** |
| Defendant, | )    **MOTION FOR** |
| | )    **TEMPORARY** |
| MARIA ROSA CORRIERE a/k/a MARIA ROSA | )    **RESTRAINING ORDER** |
| GAROFALO, QUANTUM EQUITIES, INC., and | )    **AND OTHER** |
| THE KINGS FELLOWSHIP, Inc., | )    **EMERGENCY RELIEF** |
| | ) |
| Relief Defendants. | ) |

## I.    <u>INTRODUCTION</u>

From January 2001 to the present, Sebastian Corriere ("Corriere") has been offering and selling at least two fraudulent high yield private placement programs purporting to involve the trading of medium term notes or MTNs. Corriere has raised approximately $2.9 million, luring investors into his prime bank schemes by promising risk-free returns of 100% per week. Contrary to Corriere's representations, however, the trading programs do not exist, investors have not received the promised returns, and their principal has been lost. Corriere now admits that at least one of the purported trading programs was a scam.

Nonetheless, Corriere is still selling these fraudulent investments and is soliciting more investors. He must be enjoined from continuing his fraudulent course of conduct.



## III.  FACTS

Corriere, of Clearwater, Florida, holds himself out as a preacher and a doctor of theology, but has no known means of support. [Affidavit of Duane N. Ware ("Ware Aff."), Ex. A., Pgs. 6-9]. He was the sole director of two Florida corporations, Quantum Equities, Inc. ("Quantum Equities") and The Kings Fellowship, Inc. ("Kings Fellowship"). [Ware Aff., Ex. B]. The State of Florida administratively dissolved Quantum Equities in 1996 and Kings Fellowship in 1994 Id.

### A.    The Lai Trading Program

From January 2001 through February 2001, Corriere solicited investors across the country for participation in a so-called "$200 million dollar high yield private placement project." [Ware Aff., Ex. C and A]. Corriere raised approximately $2.9 million from over sixty investors located across the United States and Canada. [Ware Aff., Exs. A, Pgs. 33-34, D, E, and F]. Corriere told investors he had a contractual agreement with David Lai, a Hong Kong businessman, to pool investor funds to pay for costs associated with entering into a high yield private placement for the trading of mid-term notes ("MTN(s)"). [Ware Aff., Ex. A, Pgs. 31-36, C]. For each $1.5 million in investor funds that Corriere raised, Lai would put up $100 million of his own funds to be used by Blue Jay, Inc., a so-called trader of MTNs in Alberta, Canada. Id. Under the trading agreement between Lai and Blue Jay, Lai would make funds available for a high yield private placement for the purpose of receiving profits. Id. The trading agreement was for a period of thirty days and to be renewed for eleven successive thirty-day periods. Id.

Each investor entered into a "Participation Agreement" with Corriere. [Ware Aff., Ex. C]. These Participation Agreements, which Corriere drafted, are investment contracts. Corriere represented in the Participation Agreement that he had agreed to pay $3 million for Lai's costs for releasing $200 million for trading in a high yield private placement program. [Ware Aff., Ex.

C]. According to the Participation Agreement, the investor's expected yield was 100 percent per week for the duration of the trading agreement, which was expected to last eleven months. [Ware Aff., Ex. C]. Pursuant to the Participation Agreement, investors sent their funds to a trust account in the name of Paul Formby at the Bank of Montreal in Vancouver, British Columbia, Canada. Id.

In soliciting investors, Corriere made misrepresentations relating to the nature and risk of the investment. Corriere told investors that they would earn a 100 percent return per week for the duration of the trading agreement. [Ware Aff., Ex. G, Pgs. 86-87, ¶ 32]. He informed at least one investor that she could expect to receive profits staring in first week of February 2001. [Ware Aff., ¶ 32]. Corriere had no basis for this claim, since MTN trading programs do not exist. [Ware Aff., Ex. H]. In addition, Corriere stated in the Participation Agreement that he had conducted his own due diligence with respect to the trading agreement between Lai and Blue Jay. [Ware Aff., Ex. C]. Corriere admitted, however, that he had neither been to Blue Jay's office nor sent them a letter. [Ware Aff., Ex. A, Pgs. 39-40]. In addition, in or about October 2000 – before he began soliciting investors – Corriere was informed that the deal appeared to be a sham. [Ware Aff., ¶ 31]. Yet he represented to investors that these high yield private placements were "safe" and "risk-free." [Ware Aff., ¶¶ 28, 29, 30, 32]. Corriere also represented he had significant experience involving these trading programs, and that he had participated in another program that had just closed. [Ware Aff., Ex. O, Pg. 68, ¶¶ 30, 32]. He also guaranteed that the investors would not lose their initial investment. [Ware Aff., ¶¶ 28, 32].

Corriere raised approximately $2.625 million by mid-January 2001. [Ware Aff., Exs. A, Pgs. 33-34, D]. Most investor funds were wired directly from investors to Formby's trust account at the Bank of Montreal, but a small amount went directly to Quantum Equities, a

corporation controlled by Corriere located in Clearwater, Florida. [Ware Aff., Ex. I, M, ¶¶ 28,32]. The $2.625 million in Formby's account appears to have been transferred to Lai on January 19, 2001. [Ware Aff., Ex. D].

Corriere was supposed to pay the investors their proportional share from the proceeds of trading. [Ware Aff., Ex. C, ¶ 32]. Corriere told some investors to open bank accounts at Barclays Bank in Turks and Caicos Islands, British West Indies, so as to receive their profits tax-free. [Ware Aff., ¶¶ 32]. In addition, he also told investors that he could assist them in setting up an Unincorporated Business Trust Organization or "UBTO" in order to receive the profits "tax-free" in the United States. Id.

There was no registration statement filed or in effect for the investment contracts that Corriere was and is selling. [Ware Aff., Ex. K]. He solicited and is soliciting investors by use of the telephone, facsimile, and e-mail. [Ware Aff., Exs. G, Pgs. 86-87, L, ¶ 28]. He sent the Participation Agreements to investors by facsimile. Id. At Corriere's behest, investors wired their investment funds to Paul Formby. [Ware Aff., Ex. M, ¶¶ 28, 32].

**B.    10-1 Joint Ventures**

After Corriere sent the $2.625 million to Lai, Formby continued to receive additional investor funds for the Lai investment. [Ware Aff., Exs. A, Pgs. 34-35, E, and F]. Formby received at least an additional $282,996 in investor funds. Id. Throughout March 2001, Corriere asked investors who had sent in money after the Lai deadline to invest in a program called 10-1 Joint Ventures. [Ware Aff., Exs. E and F, ¶ 32]. 10-1 Joint Ventures was a high yield private placement fraud supposedly involving a $1 million dollar high yield private placement operated by Trisha Lattimer. [Ware Aff., Exs. E, F, and N]. Corriere offered 10-1 Joint Ventures as an alternative to Lai's program, telling investors that the Lai investment was experiencing

4

difficulties and 10-1 showed better promise. [Ware Aff., Ex. Q, ¶ 32]. Investors were offered

the option of transferring their funds from Formby's account to 10-1 Joint Ventures. [Ware Aff.,

Ex. N, ¶ 32]. Twenty-one investors agreed, and Formby transferred $282,996 to the 10-1 Joint

Ventures bank account in Portland, Oregon.[1] [Ware Aff., Exs. E and F]. One other investor,

Edwin Miller, sent $15,000 directly to 10-1 Joint Ventures. [Ware Aff., Ex. G, Pgs. 65, 84].

Corriere made several misrepresentations to investors in connection with the sale of 10-1

Joint Ventures interests. Corriere told investors that 10-1 Joint Ventures was a program similar

to the Lai investment. [Ware Aff., Ex. ¶ 32]. These trading programs, however, do not exist.

[Ware Aff., Ex. H]. According to Corriere, 10-1 was a smaller trading program and would

produce a quicker return than the Lai investment. [Ware Aff., ¶ 32]. Corriere told investors that

like the Lai investment, investors could not lose their initial investment. [Ware Aff., Ex. G, Pg.

84, ¶ 32]. In at least one case, he told an investor that the return on the 10-1 program was

guaranteed. [Ware Aff., 32]. Corriere promised a return of 100 percent per month for several

months. Id.

### C.   Corriere's Misuse of Investor Funds

Corriere misappropriated some of the investor funds. [Ex. A, Pgs. 64-65]. In January

2001, George Anderton invested in the Lai program. [Ex. O, Pg. 68]. He gave Corriere a

cashier's check for $30,000 made out to Quantum Equities, and wired $15,000 to Formby.

[Ware Aff., Ex. O, Pgs. 65-68]. Corriere deposited the $30,000 check into Quantum Equities'

---

1 The FBI discovered the 10-1 Joint Ventures fraud in connection with an unrelated investigation
and seized 10-1 Joint Ventures funds on May 16, 2001. [Ware Aff., Ex. ¶ 27]. Corriere, on
behalf of his investors, submitted two claims totaling $282,996 to the FBI for restitution for the
amounts transferred to Griffin from the Formby account. [Ware Aff., Exs. E and F]. Over
$200,000 was returned to Corriere's investors pursuant to court-ordered restitution. [Ware Aff.,
Ex. 27].

account on January 5, 2001, which at the time had a balance of $145.58. [Ware Aff., Ex. P]. There were no other deposits over $200 dollars to the account until April 26, 2001. Id. On January 16, 2001, Corriere transferred $1,000 of that amount to Kings Fellowship. Id. In addition, he converted $11,000 of the $30,000 to cash. Id. On January 18, 2001, he wired $2,025 to a bank account at Barclays Bank in the Turks and Caicos, British West Indies. [Ware Aff., Ex. J]. From February through mid-April 2001, Corriere used the funds remaining in his account to pay his electric bill, water bill, and bank charges. [Ware Aff., Ex. P]. On April 30, 2001, Corriere sent at least $12,000[2] in investor funds from the Quantum Equities account to his mother's bank account, Maria Rosa Corriere ("Maria Corriere") at the Bank of America. [Ware Aff., Ex I and P]. Accordingly, Corriere did not use the $30,000 for the Lai investment.

**D.    Corriere's Status Reports**

From February to August 2001, Corriere e-mailed status reports to his investors, seeking to placate them with convoluted explanations of various problems associated with the trading program. [Ware Aff., Ex. Q]. Corriere continued to assure investors that the trades would come through. Id. For example, in a June 1, 2001 status report, Corriere advised investors: "I must respect the limitations of disclosure imposed in these ventures and this time for safety purposes I cannot disclose concrete and quantitative details." Id. He did, however, indicate that the trade date was close and that he could "state, without reservations, that success is assured." [Ware Aff., Ex. Q].

Eventually, in an August 15, 2001 status report, Corriere conceded to investors that the

---

[2] On April 26, 2001, Corriere deposited two checks totaling $40,000 into Quantum Equities' account. On April 30, 2001, he wrote a check from Quantum Equities' account for $52,000 to his mother's account at the Bank of America.

trading program with Lai was a scam.  [Ware Aff., Ex. S].  Corriere advised investors that he had

hired a high-yield investment investigator to recover investor funds from Lai.  Id.  Corriere also

acknowledged that over 800,000 high-yield investment frauds are committed every year in the

U.S.  Id.  Further, Corriere claimed he was working on another trade in Germany and would pay

back the investors as soon as possible.  Id.  In an October 2001 status report, Corriere stated that

he had clients in Europe that would soon complete their first trade in Germany and provide "cash

flow" to payback the Lai investors.  [Ware Aff., Ex. R].

      E.      **Corriere's Ongoing Solicitation**

      From January 2002 to the present, Corriere has solicited several investors for additional

funds.  [Ware Aff., Ex. G, Pg. 85 and L, ¶¶ 28, 29, 30].  Corriere phoned investors and told them

that he was in Africa working on a trade and needed money to release over $124 million for

additional trading programs.[3]  Id.  Corriere faxed documents to prospective investors, which

supposedly demonstrated that he had the $124 million available.  [Ware Aff., Exs. T and U, ¶

28].  These documents, which are in French, include the dollar amount of $124.5 million,

language about beneficiaries, and also identify U.S. banks, including Corriere's and his mother's

accounts at Bank of America.  Id.

      Corriere has solicited some investors asking for "loans."  [Ware Aff., ¶¶ 28, 29, 30].

These so-called loans offered astronomical returns.  Id.  In a March 12, 2002 e-mail, Corriere

asked an investor for $10,000 to complete legal work for his various financial projects in West

Africa.  [Ware Aff., Ex. L].  Corriere requested that the investor send funds via Western Union to

---

[3] Corriere made different representations as to actual amount he had in Africa for the trading
program in London, England.  He told some investors he had $124 million and others that he had
$125 million.

Corriere in Africa and promised a return of $100,000 for every $1,000 received.  Id.

Alternatively, Corriere offered the investor a partnership for an investment of $10,000 to

$20,000.  Id.  With the partnership offer, Corriere promised to return to the U.S. within the next

two weeks with at least $1,000,000 dollars.  Id.  As a result of his solicitations, Corriere has

received at least $3,000, some of which came from previously defrauded investors.  [Ware Aff.,

¶¶ 28, 29, 30].  Corriere returned to the U.S. sometime at the end of March 2002.  [Ware Aff., ¶¶

29, 30].  Corriere has plans to return to Africa as soon as he has raised enough money to release

the $124 million.  [Ware Aff., ¶ 30].

## IV.  ARGUMENT

### A.  The Standard for SEC Injunctions

Section 21(d) of the Exchange Act entitles the Commission, "upon a proper showing," to

seek a temporary injunction or restraining order.  This "proper showing" is a "justifiable basis for

believing, derived from reasonable inquiry and other credible information, that such a state of facts

probably existed as reasonably would lead the SEC to believe that the defendants were engaged in

violations of the statutes involved."  SEC v. Unifund Sal, 910 F.2d 1028, 1041 (2d Cir. 1990);

SEC v. General Refractories Co., 400 F. Supp. 1248, 1254 (D.D.C. 1975).  Because the SEC

approaches the Court "not as an ordinary litigant, but as a statutory guardian charged with

safeguarding the public interest in enforcing the securities laws," the SEC has a lower burden than a

private party seeking a temporary restraining order or preliminary injunction.  SEC v. Management

Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975).  The SEC is not required to show irreparable

injury or a balance of equities in its favor.  See, e.g., SEC v. Unifund SAL, 910 F.2d 1028, 1036

(2d Cir. 1990); SEC v. Torr, 87 F.2d 446, 450 (2d Cir. 1937); SEC v. Musella, 578 F. Supp. 425,

434 (S.D.N.Y. 1984).  Accordingly, the SEC may obtain injunctive relief upon showing (1) a

*prima facie* violation of the securities laws; and (2) a reasonable likelihood that the wrong will be repeated.  SEC v. Unique Financial Concepts, Inc., 196 F.3d 1195, 1199 n.2 (11th Cir. 1999), citing SEC v. Mangement Dynamics, Inc., 515 F.2d 801, 806-07 (2d Cir. 1975); SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972).

**B.     Corriere Violated, And Continues to Violate the Antifraud Provisions of the Federal Securities Laws.**

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, prohibit using a fraudulent scheme or making material misrepresentations and omissions in the offer or sale, or in connection with, the purchase or sale of any security.  United States v. Naftalin, 441 U.S. 768, 779 (1979).  In order to prove a violation of these provisions, the alleged misrepresentations or omissions must be material.  A fact is material if there is a substantial likelihood that a reasonable investor would view that fact as significantly altering the total mix of information available.  Basic, Inc. v. Levinson, 485 U.S. 224 (1988).  See also TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976); SEC v. Carriba Air, Inc., 681 F. 2d 1318, 1323 (11th Cir. 1982) (quoting TSC Industries, 426 U.S. at 449).

Establishing violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder also requires a showing of scienter.  Aaron v. SEC, 446 U.S. 680, 695-97 (1980).   Scienter is a "mental state embracing intent to deceive, manipulate or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976).  The Eleventh Circuit has concluded that scienter may be established by a showing of knowing misconduct or severe recklessness.  Carriba Air, 681 F. 2d at 1324.  Severe recklessness requires a showing that the defendant made "highly unreasonable omissions and misrepresentations involving not merely simple or even inexcusable negligence but extreme departure from standards of ordinary care and

9

presenting danger of misleading buyers or sellers which is either known to defendant or is so obvious that defendant must have been aware of it." Broad v. Rockwell Intern. Corp., 642 F.2d 929, 961-62 (5th Cir. 1981). Actions pursuant to Sections 17(a)(2) and (3) of the Securities Act do not require a showing of scienter. Aaron, 446 U.S. at 695-97.

As demonstrated below, each of the elements of a violation of the antifraud provisions is present here. Corriere violated, and continues to violate, the antifraud provisions. He was at least severely reckless in making or disseminating false and baseless claims about the existence of high yield trading programs, the return investors would receive, and the risk of the investments.

### 1.   The Investments are Securities

The investments offered and sold by Corriere are securities in the form of investment contracts. Section 2(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define the term "security" to include "investment contracts." An investment contract exists if there is (1) an investment of money, (2) in a common enterprise, based upon (3) an expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

In this case, the first element of the Howey test is met because investors paid Corriere approximately $2.9 million to invest in what they believed were high yield trading programs. The second element, common enterprise, is also met. The Eleventh Circuit requires a showing of vertical commonality to establish a common enterprise. See Villeneuve v. Advanced Business Concepts Corp., 698 F.2d 1121 (11th Cir. 1983), aff'd en banc, 730 F.2d 1403 (11th Cir. 1984). A common enterprise exists where "the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." SEC v. Unique Financial Concepts, Inc., et al., 196 F.3d 1195, 1199 (11th Cir. 1999).

Vertical commonality exists here because the investors' interests are dependent upon the efforts and success of Corriere and those who run the trading programs in which he purports to invest. Corriere had the purported contract with Lai and did "due diligence" on the trading agreement. [Ware Aff., Ex. C]. Corriere was to share in the profits of the purported trading program, and at least a portion of his profits were to be distributed to investors. [Ware Aff., Ex. A, Pgs. 33-40, and C]. Accordingly, the success of the investment is inextricably tied to Corriere's ability to pool sufficient funds and place them in a trade that was supposed to generate the returns.

The third element of the Howey test is also met here. The Supreme Court has defined the concept of "profits" as "either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds . . .." United Housing Found., Inc. v. Forman, 421 U.S. 837, 852 (1975). To show the expectation of profits, investors must be motivated to invest solely by the desire to earn returns on the investment rather than by the desire to use or consume the item purchased. Id. at 852-53. In the Eleventh Circuit, courts look to "the amount of control that the investors retain[ed over their investment] under their written agreements," as well as the actual ability of the investors to manage their investments, in determining whether the investment meets the third prong of the Howey test. Unique Financial, 196 F.3d at 1201. Here, investors were motivated solely by their desire to earn profits and they relied exclusively on others for the success of the trading program. In addition, Corriere had exclusive control over how the investors' funds were used.

Although prime bank instruments are fictitious, they are investment contracts and therefore securities. The investment – even if a sham – qualifies as a security if the parties "merely offer the essential ingredients of an investment contact." Unique Financial, 196 F.3d at

11

1200, quoting Howey, 328 U.S. at 301.  See also, SEC v. Lauer, 52 F.3d 667 (7th Cir. 1995);

First National Bank v. Estate of Russell, 657 F.2d 668, 673 (5th Cir. 1981).  "[I]t is the

representations made by the promoters, not their actual conduct, that determines whether an

interest is an investment contract (or other security)."  Lauer, 52 F.3d at 670.   These investments

are therefore subject to the federal securities laws.  See Mishkin v. Peat, Marwick, Mitchell &

Co., 744 F. Supp. 531, 553 n.10 (S.D.N.Y. 1990) ("fact that the securities did not exist does not

remove this action from the operation of the federal securities laws").  See also SEC v. Bremont,

954 F. Supp. 726, 732 (S.D.N.Y. 1997).

### 2.    False Statements by Corriere Regarding the Trading Programs

Corriere made misrepresentations to investors about the high yield private placements he

was offering and selling.  First, Corriere represented to investors that their funds would be used

to facilitate the trading of medium term notes purchased by the trader and resold for a profit.

[Ware Aff., Ex. C].  Corriere represented to investors that he had done "due diligence" on the Lai

trading agreement, implying that he had verified the existence of the program and the truth of the

claims made by Lai and Blue Jay.  Id.  The program Corriere offered, however, is actually a kind

of a prime bank scheme.  [Ware Aff., Ex. H].  These prime bank schemes do not exist.  Since the

early 1990s, the SEC, the Federal Reserve, and other law enforcement and regulatory authorities

have been warning investors about the dangers of prime bank fraud and similar "high-yield"

investment schemes.  [Ware Aff., Ex. H].

Corriere also told investors in the Lai program that they would earn returns of 100 percent

per week on their investments for the duration of the trade, and that payments would begin in

February 2001.  [Ware Aff., Ex. C, ¶¶ 28, 32].  In reality, however, investors earned no return

and have received no payments. Id. Corriere also told investors in both the Lai program and 10-1 Joint Ventures that their investment was safe and "risk-free", and that there was no way they could lose their initial investment. [Ware Aff., Ex. G, Pg. 84, ¶¶ 28, 32]. Instead, as Corriere has admitted to investors, the Lai deal was a scam and their money is now gone. While the 10-1 Joint Ventures investors received their principal back, it was only due to the intervention of the FBI. [Ware Aff., ¶ 27]. Corriere also told investors that they could receive their profits into an "unincorporated business trust organization" and avoid paying taxes. [Ware Aff., ¶ 32]. This too is false. [Ware Aff., Ex. V].

In at least one instance, Corriere also misrepresented the use of investor funds. He told George Anderton that his funds would be invested in the Lai program. [Ware Aff., Exs. A, Pgs. 43-44, I, O, Pgs. 66-73]. Instead, Corriere deposited those funds in bank accounts he controlled, used some of the money to pay for personal expenses, sent some of the money to an off-shore account, and sent some of the money to his mother's bank account. [Ware Aff., Exs. I and P].

These misrepresentations were material and go to the heart of the investment. No reasonable investor would have entrusted their funds to Corriere had they known that the program he was selling did not exist, that they would not receive returns, and that their principal would be lost. It would have substantially altered the total mix of information if Corriere had disclosed that these trading programs were a scam and could not generate returns as he described. These misrepresentations were made both "in" and "in connection with" the offer and sale of securities. Corriere made these misrepresentations in describing the participation agreements and soliciting the purchase thereof. [Ware Aff., C, G, Pgs. 72, 84  ¶¶ 28, 30, 32].

Finally, Corriere acted with the requisite scienter.  He knew or was reckless in not knowing that high-yield investment programs offering fantastical returns like this do not exist.

Even before he began soliciting investors, Corriere was told that the Lai investment appeared to be a scam. [Ware Aff., ¶ 31]. Moreover, there is a plethora of publicly available information from law enforcement agencies and regulatory bodies advising the public that such programs are fraudulent. [Ware Aff., Ex. H]. Corriere knew or was reckless in not knowing that what he was telling investors was false – that he had done due diligence on the investment, that the investment was safe and risk-free, and that investors would get returns of 100 percent per week. [Ware Aff., Ex. C]. He also personally diverted funds he knew were intended for the Lai program to bank accounts that he controlled. [Ware Aff., Ex. I and P]. Moreover, he continued to solicit investors for the 10-1 Joint Ventures program after he knew that the Lai program was not paying returns as promised. [Ware Aff., Ex. G, Pg. 84, R, S, ¶ 32]. Even now, after the Lai investment failed and the FBI seized 10-1 Joint Ventures, Corriere continues to solicit investors for prime bank schemes and promise ridiculous returns.

## C. Corriere Violated Sections 5(a) and 5(c) of the Securities Act

Corriere sold securities in unregistered offerings in violation of the Section 5 of the Securities Act. Section 5(a) forbids "any person, directly or indirectly . . . to sell" a security unless an appropriate registration statement is in effect. SEC v. Continental Tobacco Co. of South Carolina, Inc., 463 F.2d 137, 155-56 (5th Cir. 1972). Section 5(c) forbids "any person, directly or indirectly to offer to sell" a security unless the applicable registration statement has been filed. Id. A *prima facie* case of Section 5 violation requires a showing that: (1) a person, directly or indirectly, sold or offered to sell securities; (2) no registration statement was filed or in effect; and (3) interstate means were used in connection with the offer or sale. Id.

Corriere directly offered and sold high yield securities for which there is no registration statement filed or in effect through the use of the mails and wires. [Ware Aff., Ex. K]. Corriere

14

sent investors promotional materials via facsimile and solicited them by telephone. [Ware Aff., ¶¶ 28, 32]. Investors mailed and wired their funds to Formby for Corriere. [Ware Aff., Ex. M, ¶¶ 28, 32]. The SEC's files contain no registration statement for Corriere's offering. [Ware Aff., Ex. K]. Accordingly, Corriere has violated Sections 5(a) and (c).

### D. Corriere is Likely to Engage in Future Violations

Corriere is very likely to engage in future violations of the antifraud and registration provisions of the securities laws unless he is enjoined. The totality of the circumstances should be considered in determining the likelihood of future violations. SEC v. Holschuh, 694 F.2d 130, 144 (7th Cir. 1982). It is well established that the existence of past violations is highly suggestive of the likelihood of future violations. See SEC v. Management Dynamics, 515 F.2d 801, 807 (2d Cir. 1975). "The Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a 'reasonable likelihood' of future transgressions." SEC v. Zale Corp., 650 F.2d 718 (5th Cir. 1981). The relevant factors in determining the likelihood of future violations are: (1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances, if any, against future violations; (5) the defendant's recognition of the wrongful nature of his conduct;[4] (6) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations; and (7) the defendant's age and health. SEC v. Youmans, 729 F.2d 413, 415 (6th

---

4 This consideration is limited by SEC v. First City Financial Corp., 890 F.2d 1215, 1229 (D.C. Cir. 1989), in which the court said that "'lack of remorse' is relevant only where the defendants have previously violated court orders, see SEC v. Koenig, 469 F.2d, 198, 202 (2d Cir. 1972), or otherwise indicate that they do not feel bound by the law, see SEC v. Savoy Industries, Inc., 587 F.2d 1149, 1168 (D.C. Cir. 1978), cert. denied, 440 U.S. 913 (1979)."

Cir.), cert. denied, 469 U.S. 1034 (1984); see also, Holschuh, 694 F.2d at 144.

Given Corriere's prior conduct and his present circumstances, the inference of future violations is appropriate and a temporary restraining order and other injunctive relief is warranted. Corriere's conduct is egregious, in that he is fraudulently selling interests in programs that do not exist, and has done so for at least one and a half years. He is continuing to raise funds for these programs even though he has admitted that many high yield investment opportunities are fraudulent and knows that the Lai program was a scam. [Ware Aff., Ex. L, S ¶¶ 28, 29, 30]. Since Corriere is without any other form of employment or income, he is likely to continue selling some variation of prime bank instruments. [Ware Aff., Ex. A, Pgs. 6-9]. Finally, although Corriere is sixty-three years old, he travels around the world offering and selling prime bank instruments to U.S. and foreign investors. [Ware Aff., ¶¶ 28, 29, 30]. Accordingly, unless Corriere is subject to a temporary restraining order, he is likely to continue his fraudulent activities during the pendency of this action.

E.    **Asset Freeze, Accounting, Disgorgement and An Order Prohibiting Destruction of Records and Expediting Discovery are Appropriate**

Disgorgement is an appropriate remedy in this case so that Corriere does not benefit from his fraud. In SEC civil enforcement actions, a court has broad power to order a defendant to disgorge his or her unlawful profits and pay prejudgment interest thereon. SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1474-76 (2d Cir. 1996). Disgorgement is designed to deprive wrongdoers of their unjust enrichment and to deter others from violating the securities laws. SEC v. First City Financial Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989). Disgorgement need only be a reasonable approximation of profits causally connected to the violation, and any risk of uncertainty as to the disgorgement amount falls on the wrongdoer whose illegal conduct created

that uncertainty.  Id. at 1231-32.  Disgorgement, and prejudgment interest thereon, is appropriate against Corriere, Maria Corriere, Quantum Equities, and Kings Fellowship, to the extent any one of them is in possession of ill-gotten gains.  While Corriere may not have received any profits on the Lai investment, he has kept at least some investor funds for his own use.

An asset freeze "facilitate[s] enforcement of any disgorgement remedy that might be ordered" and may be granted "...even in circumstances where the elements required to support a traditional SEC injunction have not been established..."  See SEC v. Unifund SAL, 910 F.2d at 1041.  Courts recognize that an asset freeze is sometimes necessary to ensure that a future disgorgement order will not be rendered meaningless.  See, e.g., United States v. Cannistraro, 694 F. Supp. 62, 71 (D. N.J. 1988), aff'd in part, vacated in part, 871 F. 2d 1210 (3d Cir. 1989); SEC v. Vaskevitch, 657 F. Supp. 312, 315 (S.D.N.Y. 1987); SEC v. R. J. Allen & Associates, Inc., 386 F. Supp. 866, 881 (S.D. Fla. 1974).

The facts and circumstances here warrant an order freezing Corriere's assets.  Corriere has raised a significant amount of money and has misdirected at least some of the investor funds into his bank accounts in the U.S. and abroad.  [Ware Aff., A, Pgs. 33-40, I, J, and P].  Corriere has no other known means of support.  [Ware Aff., Ex. A, Pgs. 6-9].  As such, any remaining investor funds may be dissipated at any moment and be unavailable to compensate harmed investors.

An asset freeze against Maria Corriere, Quantum Equities, and Kings Fellowship is also appropriate, even without charging them with any wrongdoing, because they "possess illegally obtained profits but have no legitimate claim to them."  SEC v. Cherif, 933 F. 2d 403, 414 n.11 (7th Cir. 1991), cert. denied, 112 S. Ct. 966 (1992).  A person holding the property need not have done anything wrong in order for that person to be required to return the property to its rightful

owner.  In U.S. v. Cannistraro, the district court recognized that "... courts impose the remedy of constructive trust where, rightfully or wrongfully, a party has obtained property which unjustly enriches him." (emphasis added).  U.S. v. Cannistraro, 694 F. Supp. at 72 n.11.  Accord Rollins v. Metropolitan Life Insurance Co., 863 F. 2d 1346, 1354 (7th Cir. 1988) ("a constructive trust may be invoked even where the unjustly enriched party is completely blameless").  Because Maria Coriere, Quantum Equities, and Kings Fellowship received at least some investor funds that were intended for the Lai program, the Court should temporarily freeze their assets.  [Ware Aff., Ex. I and P].  In addition, it appears that Corriere was using Maria Corriere's account for other trading programs, as evidenced by the certificate and letter from Africa indicting that a portion of the $124 million was to be deposited in her account.  [Ware Aff., Ex. T and U].  Only with these asset freezes may any equitable remedy of disgorgement that this Court enters be meaningful.

Likewise, it is imperative that this Court require an accounting and prohibit the destruction of records in order to determine the whereabouts of investors funds and any ill-gotten gains that Corriere and the relief defendants may have received. An order prohibiting record destruction is also appropriate to prevent the dissipation of assets and documents before these claims can be adjudicated and to assure that whatever equitable relief might ultimately be appropriate is available. See R. J. Allen & Associates, Inc., 386 F. Supp. at 881.

### F.      Repatriation Order and Writ of *Ne Exeat* and Order Requiring Surrender of Passport

A repatriation order and writ of *ne exeat* and order requiring the surrender of Corriere's passport are also appropriate.  Corriere and Quantum Equities sent investor funds to a bank account in the Turks and Caicos Island, British West Indies. [Ware Aff., Ex. J].  Corriere and

Quantum Equities should be required to return monies that were fraudulently obtained wherever located. Corriere should also be required to surrender his passport until five days after he has submitted to the Commission with a sworn identification of all of his assets and accounts worldwide. A court has this equitable power to preserve the status quo to prevent further harm to investors. SEC v. Fulcrum Holding Co., Inc., 57 S.E.C. Docket 2594, 1994 SEC LEXIS 3473 (D.D.C. November 1, 1994) (SEC Lit. Rel. 14316) (temporary restraining order against future securities law violations required that defendant surrender passport to the court); SEC v. Shiu, 1987 SEC LEXIS 3725, 39 S.E.C. Docket 238 (September 11, 1987) (SEC Lit. Rel. 11537) (same); SEC v. Global Investment Brokers, Ltd., 1989 SEC LEXIS 672 (N.D Ill. 1989) (defendant was required to surrender passport and was prohibited from leaving the United States). Corriere is known to have bank accounts overseas and has told investors that he plans to return to Africa once he has raised sufficient additional funds to engaged in a $124 million dollar trade. [Ware Aff., Ex. J, ¶ 29]. Without a writ of *ne exeat* and an order surrendering Corriere's passport, Corriere is likely to leave the country and may dissipate assets.

**G.    Expedited Discovery Order**

Finally, an order granting expedited discovery is also required so that the Commission may take meaningful discovery in the ten-day period between the entry of a temporary restraining order and a hearing on an application for a preliminary injunction. See Fed. R. Civ. P. 65(b).

## VI.     __CONCLUSION__

For the foregoing reasons, the Court should grant the SEC's motion for a temporary

restraining order, an asset freeze, an accounting, an order requiring preservation of records, a

repatriation order, a *ne* exeat order, and an order expediting discovery and defendant's answer.

Respectfully submitted,

Dated:  April 18, 2002

Linda Ieleja Gerstman
(Designated Trial Counsel Pursuant to
Local Rule 1.05(c))
Illinois Bar No. 06204334
Branch Chief
Direct Dial No.:  (312) 353-7420

Joseph M. Mannon
Illinois Bar No. 06275428
Staff Attorney
Direct Dial No.:  (312) 353-5453

Attorneys for Plaintiff
THE UNITED STATES SECURITIES
AND EXCHANGE COMMISSION
175 W. Jackson, Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile:  (312) 353-7398